UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

ALPHA IMAGING CONSULTANTS, PLLC,
and KARL HUSSMAN, M.D.,

                 Plaintiffs,

    - against -

CARECORE NATIONAL, LLC,
CARECORE MANAGEMENT
SERVICES, INC.,
NEW YORK MEDICAL IMAGING IPA, INC.,
NYMI IPA-O, LLC,
NYMI IPA-M, LLC,
CCN-HI IPA, LLC,
CCN IPA, INC.,
CCN-WNY IPA, LLC,

                 Defendants.

------------------------------------------------------------------x



**JUDGE DANIELS**

COMPLAINT

**06 CV 13175**

RECEIVED
NOV 14 2006
U.S.D.C. S.D. N.Y.
CASHIERS

    Plaintiffs, by their undersigned attorneys, Kaplan, Thomashower & Landau LLP, and Weiss & Zarett, P.C., bring this civil action against the defendants named herein and allege as follows:

JURISDICTION AND VENUE

    1.    Plaintiffs bring this action under Section 4 of Clayton Act 15 U.S.C. § 15 to recover treble damages and the costs of suit, including reasonable attorneys' fees, against defendants for the injuries sustained by the plaintiffs in their business and property by reason of defendants' violations as hereinafter alleged of the antitrust laws, and, more particularly, Sections 1 and 2 of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, as amended (15 U.S.C. §§ 1 and 2), commonly known as the Sherman Act. This Court has jurisdiction over the subject matter and the parties pursuant to 15 U.S.C. § 15 and 28 U.S.C. § 1337.

    2.    Venue is appropriate in this Court pursuant to 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391 in that each defendant named herein is found, transacts business, has an agent or

maintains an office within this district, the claims arose in this district, and the defendants directly or indirectly performed acts within this judicial district in furtherance of the conspiracies alleged herein.

THE PARTIES

3.      Plaintiff, Karl Hussman, M.D. ("Dr. Hussman") is a highly trained radiologist licensed by the State of New York.  Dr. Hussman received his undergraduate degree from Northwestern University and his medical degree from Chicago Medical School. He completed two subspecialty fellowships, one in body imaging at Harbor-UCLA and another in neuroradiology at Yale New Haven Hospital.  He then served as an Assistant Clinical Professor at Yale University School of Medicine.  Dr. Hussman is board-certified in radiology by the American Board of Radiology, with a Certificate of Additional Qualification in Neuroradiology , and is a Senior Member of the American Society of Neuroradiology. He specializes in cross sectional imaging and is held in high regard by referring physicians he has worked with in Manhattan over the last 10 years. Dr. Hussman is the President and sole owner of plaintiff Alpha Imaging Consultants P.L.L.C.

4.      Plaintiff Alpha Imaging Consultants P.L.L.C., d/b/a "Alpha 3T MRI" ("AIC") is a New York professional services limited liability company having its principal office at 145 East 32nd Street, New York, New York.  AIC was formed February 9, 1999 and is in the business of providing state-of-the-art outpatient diagnostic imaging services for patients as hereinafter defined.  AIC is owned by Dr. Hussman and employs highly qualified and board-certified radiologists, including plaintiff Dr. Hussman, to provide the professional interpretation of diagnostic imaging results to referring physicians and patients.  These referring physicians send their patients to AIC for such procedures in order to diagnose a variety of forms of human diseases and abnormalities, including cancer, neurological disorders and circulatory/cardiac disease.

2

5.      Defendant CareCore National LLC is a New York limited liability company ("CCN").  CCN has a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York.  CCN was founded and is controlled and managed by practicing board-certified radiologists, who are members of CCN and who themselves own and operate their own independent outpatient diagnostic imaging businesses approved by CCN and from which they independently profit.  As such, the radiologists on CCN's Board, as hereinafter described, include competitors of Dr. Hussman, AIC and the radiologists employed by plaintiffs.  CCN, in combination with its Board radiologists and radiologist members, provides, and authorizes other radiologists to provide, outpatient and in-office diagnostic imaging services (hereinafter "outpatient diagnostic imaging services"), which are paid for or managed through exclusive contracts between CCN and major managed care health benefit plans, such as Oxford Health Plans, Inc., United Healthcare, Aetna, GHI HMO, GHI PPO, Health Net, Health First, HIP Healthplan of New York (hereinafter collectively "CCN-contracted managed care insurers").

6.      Upon information and belief, CCN, through various contracts, combinations and agreements, seeks to restrict and has unlawfully restricted the practice of radiology for outpatient diagnostic imaging services to a limited number of radiologists and scanning facilities which are approved by CCN for the provision of outpatient diagnostic imaging services.  Such restriction severely limits the ability of referring physicians to choose a radiologist for their patients who are subscribers of CCN-contracted managed care insurers, and thereby limits patient choice as well.

7.      Upon information and belief, defendant CCN is operated and controlled by its Board, a majority of whom are competitors with the radiologists and facilities they determine to authorize or refuse to authorize, thereby controlling competition in the market for the benefit of their individual personal stakes and interests, respectively, separate from CCN.

3

Upon information and belief, these competing CCN Board members include at least the following:

    a.    Dr. Joel Canter, a practicing radiologist and CCN-approved provider, and upon information and belief, a principal of other CCN-approved diagnostic imaging facilities and entities employing CCN-approved radiologists, including Imaging on Call, and DRA Imaging, P.C., and Hudson Valley Radiologists, P.C.;

    b.    Dr. Andrew Litt, ("Dr. Litt") a practicing radiologist, and provider competing with plaintiffs. Dr. Litt is chairman of the CCN Board, and employed and paid by New York University School of Medicine which operates the NYU Medical Center (collectively "NYU"), a competing diagnostic imaging facility providing diagnostic imaging services;

    c.    Dr. Derace L. Schaeffer, a CCN-approved radiologist and provider, employed by and a director of several companies which are diagnostic imaging providers or facilities; and

    d.    Dr. William G. Wolff, a CCN-approved radiologist, chairman of the radiology department at New York Hospital Queens, and an executive of Main Street Radiology, which are diagnostic imaging providers and facilities.

Upon information and belief, other members of CCN and of the CCN Board have combined and conspired with the above-named CCN Board members to further their independent stakes and interests to the detriment of free and open competition in the market for providing diagnostic imaging services for patient-subscribers of major managed care health benefit plans, sometimes referred to as "covered lives."

8.     Defendant CareCore Management Services, Inc. ("CMS") is a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York. Upon information and belief, CMS has combined and conspired for its own benefit with the other defendants in the unlawful acts alleged herein and by contract controls payments for services to patients covered by certain CCN-contracted managed care insurers.

9.     Defendant New York Medical Imaging IPA, Inc. ("NYMI IPA") is a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York 12590. Upon information and belief, NYMI IPA has combined and conspired for its own benefit with the other defendants in the unlawful acts alleged herein and by contract controls payments for services to patients covered by certain CCN-contracted managed care insurers.

10.     Defendant NYMI IPA-O, LLC ("NYMI IPA-O") is a New York limited liability corporation with a principal place of business at 66 Middlebush Road, Wappingers Falls, New York 12590. Upon information and belief, NYMI IPA-O has combined and conspired for its own benefit with the other defendants in the unlawful acts alleged herein and by contract controls payments for services to patients covered by certain CCN-contracted managed care insurers.

11.     Defendant NYMI IPA-M, LLC ("NYMI IPA-M") is a New York limited liability corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York 12590. Upon information and belief, NYMI IPA-M has combined and conspired for its own benefit with the other defendants in the unlawful acts alleged herein and by contract controls payments for services to patients covered by certain CCN-contracted managed care insurers.

12.     Defendant CCN-HI IPA, LLC ("CCN-HI IPA") is a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls,

New York 12590. Upon information and belief, CCN-HI IPA has combined and conspired for its own benefit with the other defendants in the unlawful acts alleged herein and by contract controls payments for services to patients covered by certain CCN-contracted managed care insurers.

13. Defendant CCN IPA, INC. ("CCN IPA") is a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York 12590. Upon information and belief, CCN IPA has combined and conspired for its own benefit with the other defendants in the unlawful acts alleged herein and by contract controls payments for services to patients covered by certain CCN-contracted managed care insurers.

14. Defendant CCN-WNY IPA, LLC ("CCN-WNY IPA") is a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York 12590. Upon information and belief, CCN-WNY IPA has combined and conspired for its own benefit with the other defendants in the unlawful acts alleged herein and by contract controls payments for services to patients covered by certain CCN-contracted managed care insurers.

15. CCN, CMS, NYMI IPA, NYMI IPA-O, NYMI IPA-M CCN-HI IPA, CCN IPA, and CCN-WNY IPA are separate entities which upon information and belief participated as co-conspirators in the offenses alleged herein, and are referred to hereinafter collectively as "CCN" when the context so requires.

16. CCN and its subsidiaries or affiliates, have entered into multiple and exclusive contracts and agreements with major managed care health benefit plans, and thereby control diagnostic imaging services provided to the plans' subscribers, numbering in the millions. Upon information and belief, CCN's share of the market for managed care health benefit plans' diagnostic imaging services has increased since 1995 and CCN is now the dominant supplier of such services for major managed care health benefit plans in the states of

6

New York, New Jersey, and in New York City and in New York County in particular, where plaintiffs' business is concentrated.  Upon information and belief, through multiple exclusive multi-year contracts with major managed care health benefit plans, CCN controls a dominant portion of the market for outpatient diagnostic imaging scans for such plan-covered lives in New York County and in other relevant geographic markets.

17.    Dr. Litt is a member and chairman of the Board of Directors of defendant CCN and directly or through a radiology practice group, a member of CCN.  Upon information and belief, Dr. Litt, through his positions on the CCN Board of Directors and as a member of CCN, directly and in combination and conspiracy with other members of the CCN Board and CCN members, a majority of whom are also competing radiologists, has the power to see to the approval, denial or removal of, and has approved, denied or removed, imaging facilities and radiologists, such as plaintiffs, from the CCN network, who are or would be competitors in New York County with Dr. Litt and his affiliated radiologists at NYU and other radiologists who are on the CCN Board or are CCN members, who have their own independent CCN-approved practices.

18.    Upon information and belief, by reason of Dr. Litt's employment at NYU and affiliation with the other defendants and membership in CCN, Dr. Litt receives income as a member of CCN and additional compensation based on dollar volume from the services provided by himself and other radiologists at NYU for services of interpreting diagnostic imaging scans for patients pre-approved by CCN for imaging and payment.  Thus, Dr. Litt obtains a direct financial benefit, through his aforesaid positions and relationships, from providing diagnostic imaging services through his radiology practices approved by CCN.  As such, Dr. Litt, in his role as a CCN Board member and as a direct or beneficial member of CCN, and in conspiracy with the other Board members, CCN members, and the other defendants, has the power to control and thereby exclude or eliminate competition in the market as a whole,

including eliminating the plaintiffs' practices and facilities, which would otherwise be competitors of Dr. Litt, his affiliated practices and facilities. Upon information and belief, prior to commencement of this action, Dr. Litt in furtherance of the conspiracy has acted to eliminate competing radiologists and competing facilities in New York County in the market for outpatient diagnostic imaging as hereinafter described. Upon information and belief, at all times relevant, Dr. Litt has been employed by or otherwise paid by and through CCN and his affiliated radiology practices and accordingly has had an independent personal stake in furthering the unlawful acts alleged herein.

19.     Upon information and belief, except to the extent competition has been hindered, limited, and restrained by the antitrust violations of defendants and their co-conspirators as alleged herein,  Dr. Litt and his affiliated practice at NYU is a competitor of plaintiffs AIC and Dr. Hussman in the market for providing outpatient diagnostic imaging services in New York County. Dr. Hussman and his project manager, David Longton, met with Dr. Litt at NYU during construction of the new site for plaintiff AIC and offered Dr. Litt to staff AIC with members of the NYU faculty practice, of which Dr. Litt is a member. Dr. Litt subsequently advised plaintiffs that NYU decided to block the affiliation since it wanted to avoid increased competition.

20.     Prior to certain of the unlawful acts alleged herein, Dr. Hussman and radiologists employed by plaintiffs were approved directly by several of the major managed care health benefit plans including Health Net and HIP to provide diagnostic imaging at 254 West 31st Street, New York, New York 10001, a site operated by AIC. Plaintiffs were therefore able to provide and be paid for both the technical and professional interpretation components of outpatient diagnostic imaging services for patients who were subscribers of health benefit plans, and who were referred by various referring physicians in the community. In addition, plaintiff Dr. Hussman was a CCN-approved and credentialed provider to read MRI scans when he was

8

the Medical Director at Open MRI of Smith Haven in Suffolk County, and a radiologist at Seaport MRI in Manhattan and at Marine Park Radiology in Brooklyn. Accordingly, plaintiffs and their employee radiologists were credentialed and approved by CCN or directly by health benefit plans as competent and fully qualified to provide professional services to subscribers of health benefit plans.

21.    Upon information and belief, pursuant to exclusive contracts with defendants, the health benefit plans under which plaintiffs were approved including HIP and Health Net terminated their approval of plaintiffs. Thereafter these plans required all diagnostic imaging services to be managed and approved by CCN. At all times prior thereto, plaintiffs' services to the patient subscribers of the plans which had approved plaintiffs were satisfactory or exemplary. Upon information and belief, the termination of Dr. Hussman and AIC as authorized providers and facilities by the managed care health plans was pursuant to an unlawful contract, combination and conspiracy in restraint of trade between CCN and the other defendants and co-conspirators to eliminate plaintiffs as competitors and to control the market, as herein alleged.

22.    Upon information and belief, various other individuals and entities, both known and unknown to plaintiffs and not named as defendants in this Complaint, participated as co-conspirators with the named defendants in the offenses alleged herein and performed acts and made statements in furtherance thereof. These individuals and entities include, without limitation, during the relevant times, certain of the corporate defendants' executives, members, board members, radiologists and employees. Plaintiffs may seek to amend this Complaint to add additional defendants as appropriate.

<u>INTERSTATE TRADE AND COMMERCE INVOLVED</u>

23.    Advances in medical technology have made available newer and more effective diagnostic imaging equipment and techniques. Such diagnostic imaging modalities

include magnetic resonance imaging ("MRI"), Computerized Axial Tomography ("CAT" or "CT") scans and ultrasound. CT scanning is used to view the internal structure of the patient's body with pinpoint accuracy by x-rays which are measured by detectors in the scanner. A computer then processes those measurements to produce pictures of the body's internal structure and the location of abnormalities.

24.     MRI scanning is used to create images of a patient's anatomy by measuring the change in radiofrequency waves as they are transmitted through body tissue immersed in a strong magnetic field. A computer processes the radio waves received from that tissue to produce the images. The stronger the MRI scanner's magnet, the greater the detail. A 3.0 Tesla ("3T") scanner produces nearly twice the detail as a 1.5 Tesla scanner. Therefore, a facility possessing a 3.0 Tesla scanner is capable of providing images which are nearly twice the quality of a facility operating a 1.5 Tesla scanner. This increased quality allows detection of subtle yet potentially life-threatening abnormalities such as brain aneurysm which may be missed by a 1.5 Tesla scanner.

25.     MRI scans assist referring physicians in making better and more informed decisions in diagnosing cancerous tumors and other abnormalities, predicting therapeutic alternatives, pinpointing the best treatment approaches and monitoring patient progress. Such scans and interpretation are referred to herein as MRI services.

26.     Diagnostic modalities provided by plaintiffs and available for outpatient diagnostic imaging include MRI, CT and ultrasound. The foregoing modalities constitute various forms of "diagnostic imaging" available to patients through plaintiffs to diagnose a variety of medical problems.

27.     Patients diagnosed with abnormalities often need follow-up diagnostic imaging scans at regular intervals on the same scanning equipment and preferably interpreted by the same radiologist in order to accurately compare and assess changes in the patient's scan results.

28.     Facilities to provide state-of-the-art, outpatient diagnostic imaging services involve comprehensive practice management and expense.  Plaintiffs leased  a Siemens Trio 3T MRI scanner, a Siemens Emotion 16 Multislice CT scanner and an Acuson Antares ultrasound scanner for nearly $4 million; leased a space exceeding 7,000 square feet on East 32nd Street in Manhattan for approximately $25,000 a month; completed architectural plans for 3 floors in order to build  control/computer rooms and administrative offices, reception area, washrooms and storage; installed sophisticated new plumbing and electrical systems;  constructed a room for the 3T scanner requiring 6-sided steel walls to shield from extraneous magnetic field interference and 6-sided copper walls to shield radiofrequency waves; and installed an elevator system and increased the thickness of the foundation underneath the 3T scanner to 4.5 feet.  To date plaintiffs have paid over $2 million for such construction and insurance, including expensive flood insurance since the scanners are located in the basement. Plaintiffs hired AART certified CT and MRI medical technicians and an RDMS certified ultrasound technician, and hired support staff including 4 marketers, to increase the number of patient scans in an attempt to offset costs and loss of patients and lost  revenue due to exclusion from CCN.

29.     A typical diagnostic imaging scan is billed to the patient's benefit plan by the radiologist or the radiologist's practice group for hundreds or thousands of dollars,

11

depending on the modality.  Such charges encompass both charges to administer the scan (the technical component) and the radiologist's professional fee to interpret the scan for the referring physician.  Patients with managed care health benefit plan coverage will have all or most of those charges paid for by the benefit plan directly or through a contract administrator, such as defendant CCN, which controls the services to the plan's subscribers through defendants' exclusive contracts with each plan.

   30. Upon information and belief, the type of MRI machine operated by plaintiffs, a Siemens Trio 3T scanner with TIM technology, produces better images than open magnet MRI scanners and 1.5 Tesla MRI scanners or any other 3T scanner including the General Electric (GE) or Phillips 3T scanners.  Upon information and belief, at this time, the only other outpatient imaging center in New York County operating a 3T MRI is CCN-approved Lenox Hill Radiology & Medical Imaging Associates, P.C. and NYU Medical Center.  Upon information and belief, the only Siemens Trio 3T MRI scanners in New York County other than plaintiffs' are located at NYU Medical Center and are used primarily for research, with long wait times for clinical outpatient scanning.

   31. Outpatient diagnostic imaging services require the patient to travel to a diagnostic imaging facility which has the expensive, high-technology medical equipment and technical personnel to perform a scan on the patient.  Patients will typically be referred for a diagnostic imaging scan by their referring physician to a location geographically convenient to the patient's work or residence.  Such patients will not practicably travel long distances from their work or residence to obtain a scan.  Therefore, the market for such services is localized to the patient and referring physicians.  But for the unlawful acts alleged, this need for outpatient

diagnostic imaging services should result in competition among local providers and facilities in localized geographic areas within the States of New York and New Jersey, as well as within New York County and within specific parts of New York County.  However, in these geographic markets and submarkets CCN and the co-conspirators approve only selected radiologists and physicians which limits competition, limits the number and quality of available scanners and thus promotes misdiagnosis, restricts patient choice and delays patient diagnosis and treatment.

       32.     Except to the extent competition has been hindered, limited, and restrained by the antitrust violations of defendants and their co-conspirators as alleged herein, managed care outpatient diagnostic imaging services controlled or provided by those radiologists approved by CCN are in substantial, direct competition with such services provided by non-CCN-approved radiologists, including plaintiffs.  Moreover, the facility operated by plaintiff AIC, capable of providing diagnostic imaging services which are not approved by CCN, is or would be in competition with facilities which are approved by CCN.

       33.     Outpatient diagnostic imaging services for patient-subscribers of managed care health plans approved or controlled by CCN, and those services which are or would be in competition with the CCN-approved providers, are offered in interstate commerce to patients traveling in interstate commerce, and at facilities located in numerous states, and utilizing medical equipment and supplies which travel in interstate commerce.

       34.     Accordingly, the conduct of defendants and co-conspirators which forms the basis of this compliant directly and substantially affects the flow of interstate commerce.

13

## FACTS COMMON TO THE VIOLATIONS ALLEGED

35.     Upon information and belief, CCN has long term, exclusive contracts to manage and provide diagnostic imaging services for all subscribers with major managed care health benefit plans, including Oxford, Aetna, HIP, Group Health, Inc. ("GHI") HMO, GHI PPO, Horizon Blue Cross and Blue Shield of New Jersey,  Health Net, Health First, United Healthcare and Health Plus of Michigan, among others.  These benefit plans typically receive prepayments of premiums on behalf of their subscribers, which are then used to pay for health care services provided to the subscribers.  CCN describes itself as "the fastest growing radiology benefit management company in the county" and as "the nation's leading diagnostic imaging management company."  Upon information and belief, CCN, through its exclusive contracts with the major managed care health benefit plans, controls a dominant share of the market and geographic submarkets for outpatient diagnostic imaging services provided to health plan patients and to managed care health plan patients in New York and in New York County in particular.

36.     CCN's aforesaid exclusive contracts with this large number of CCN-contracted managed care insurers encompass millions of plan subscribers, or "covered lives." Specifically, CCN controls delivery of outpatient diagnostic imaging services to millions of subscribers of such plans by limiting the approved radiologists and facilities to those chosen by CCN's competing members and competing Board members, while simultaneously excluding other qualified providers and facilities in order to limit competition in the market.  Patient-subscribers who are covered by the CCN-contracted managed care insurers' plans must obtain their outpatient diagnostic imaging services only through CCN-approved providers and facilities

14

in order for the services to the patient to be paid for under the plan. Moreover, CCN payments to providers are at prices artificially fixed and determined by CCN, rather than by open competition in a free market.

37.     Upon information and belief, pursuant to CCN's exclusive contracts with these major managed care health benefit plans, subscribers of the plans who are referred by their own physicians for outpatient diagnostic imaging services must be precertified by CCN in order to have their diagnostic procedure fully reimbursed. A condition for such pre-approval is that the subscriber-patients must have their imaging performed only at a CCN-approved facility, and must have their scans read and interpreted only by a CCN-approved radiologist. Thus, CCN limits competition by determining which facilities and radiologists it will permit within its "approved" group and thereby controls both the facilities and radiologists allowed to compete for services to these millions of patients. Upon information and belief, CCN further requires radiologists to be approved at a specific CCN-approved facility, notwithstanding that the radiologist may have been previously approved by CCN at another CCN-approved facility. Accordingly, injury to plaintiffs from the unlawful termination of their managed care approvals by defendants, and defendants' unlawful exclusion of plaintiffs, are inextricably intertwined with the antitrust injuries defendants inflict marketwide on plaintiff Dr. Hussman and other qualified radiologists.

38.     CCN is therefore a group of competitors with market power, who by horizontal agreement and for their individual personal stakes, exclude other competitors and facilities, including plaintiffs' higher quality Siemens 3T scanner, from providing services to

15

millions of subscribers of managed care health benefit plans, through CCN's multiple exclusive plan contracts and other agreements.

39.     CCN further provides that outpatient diagnostic imaging services which it approves, at the limited facilities it approves, and only by those limited radiologists whom it approves, will be reimbursed by CCN to the approved providers only under a schedule of prices fixed and controlled at artificial levels by CCN and by the independent competing radiologists who control CCN. Accordingly, there is no price competition among CCN-approved providers and facilities because the prices are fixed by horizontal agreement among the competing radiologists controlling CCN as well as by the agreements with the CCN-approved radiologists. Among other anticompetitive effects, this harms plaintiffs by artificially depressing prices that plaintiffs can charge for their services in the market as a whole. Moreover, CCN adjusts the prices it will pay to radiologists on a monthly basis to a higher or lower amount, depending on utilization and the profit CCN seeks to achieve for itself. Therefore CCN has no economic risk on its contracts with the managed care health benefits plans for whom CCN contracts to provide patient services.

40.     Upon information and belief, and in furtherance of the unlawful contracts, combination, conspiracy and monopolization alleged herein, CCN further fixes and controls prices in an unlawful and discriminatory manner in restraint of trade by reimbursing CCN members at a higher rate for the same services than reimbursement to other providers approved by CCN.

41.     By reason of its exclusive contracts, as hereinabove alleged, CCN controls outpatient diagnostic imaging services for in excess of 24,000,000 subscribers or "covered lives"

16

and, upon information and belief, CCN controls outpatient diagnostic imaging services for over 60% of the covered lives of major managed care plans serving New York County and representing a dominant share of the covered lives in New York County.

42.     By reason of CCN's dominant market control of covered lives, through the health benefit plans with which CCN has exclusive contracts, approval by CCN as a CCN-approved diagnostic imaging facility and approval by CCN as a CCN-approved radiologist is necessary for effective competition in this market and CCN is able to control price and competition in the market.  Plaintiffs and other would-be competitors cannot negotiate and contract directly with the managed care health benefit plans which are under exclusive contracts with CCN.  Therefore, plaintiffs cannot compete with defendants, cannot provide services to those plans' millions of subscriber-patients, and there is no price competition among CCN-approved radiologists and facilities for the fees for diagnostic imaging.

43.     Moreover, since referring physicians prefer to refer all their patients to a single imaging facility that can service all their patients irrespective of the patient's specific health plan, exclusion of plaintiffs from such a large share of the managed care health plan patient market further injures plaintiffs by eliminating physician referrals even for the referring physician's patients who are not covered by CCN-contracted managed care insurers.

44.     Despite plaintiffs having been previously qualified and credentialed at certain times directly by CCN and managed care health benefit plans, as hereinabove alleged, plaintiffs have been repeatedly rejected by CCN and excluded from competition with other approved CCN providers in New York County.  In the Spring of 2004, plaintiffs then located at 254 West 31st Street, New York, New York 10001 completed and submitted the necessary

17

documentation for application to the CCN network of approved providers and facilities for

outpatient diagnostic imaging services, which included a 1.5 Tesla MRI scanner and planned

installation of a 3.0 Telsa MRI scanner. Shortly thereafter, in or about August 17, 2004

plaintiffs were informed that the Management Committee of CCN as a group had met and

agreed on or about August 12, 2004 that plaintiffs should not be accepted into the CCN network

of approved providers and facilities.

        45.     Even prior to 2004, upon information and belief, on August 14, 2003, the

day of a major regional power blackout, the regional CCN Credentialing Director, Jane

Komarow visited the AIC site and advised plaintiffs that if plaintiffs installed an MRI scanner

having the stronger field strength of 3.0 Tesla, then there would be "no problem" obtaining

CCN's approval for plaintiffs to be included in the CCN network, because of CCN's claimed

commitment to quality and to providing patient access to improved new technology such as the

3T scanner. In subsequent discussions, Ms. Komarow also stated there would be "no problem"

obtaining CCN's approval if AIC moved only a short distance from the West 31st Street location.

        46.     In order to facilitate installation of the larger, more powerful 3.0 Tesla

MRI scanner, and relying on the aforesaid statements of defendant's Credentialing Director,

plaintiffs in February 2005 relocated their offices to 145 East 32nd Street, New York, New York

10016, a short distance from the prior site, and commenced construction and installation.

Plaintiffs installed the Siemens Trio 3.0 Tesla MRI scanner at that site. Moreover, this location

was less than 100 feet from a CCN-approved facility known as Midtown MRI which had closed

in or about 2004, so that additional access for CCN-covered patients should have been needed in

that area.

47.     In September 2005, plaintiffs, then located at their current address at 145

East 32nd Street, New York, New York again completed and submitted the necessary

documentation for application to the CCN network of approved providers and facilities for

outpatient diagnostic imaging services which included the Siemens 3.0 Tesla MRI scanner, as

well as a Siemens CT scanner and an Acuson ultrasound scanner.  Shortly thereafter, in or about

December 12, 2005, plaintiffs were informed that the Management Committee of CCN as a

group had met and again agreed on or about December 1, 2005 that plaintiffs should not be

accepted into the CCN network of approved providers and facilities.

48.     In each of the aforesaid rejections of plaintiffs, defendant CCN gave the

identical reason: that it had determined "the imaging services available through the current

participating providers in the geographic area where your facility is situated continue to meet or

exceed the patient accessibility requirements."  CCN further stated that its "August 12, 2004

determination remains in effect."  Both of these statements failed to acknowledge that the

second application was for a different site with potential to serve a geographic area in addition to

the area covered by the first site application and that the second site was on the same block as

Midtown MRI, a CCN-approved provider which had just closed in 2004.

49.     Moreover, at all times relevant, upon information and belief, the "current

participating providers in the geographic area" of plaintiffs for outpatient diagnostic imaging

provided insufficient accessibility of services for patients because patients seeking diagnostic

imaging in that geographic area have been advised of substantial waiting times to schedule

appointments at CCN-approved locations for 3T scanner imaging studies.  These included

waiting periods from time of call until time of appointment of up to 2 weeks for outpatient 3T

19

MRI scans at the NYU Medical Center by non-NYU physicians.  NYU's Dr. Edmond Knopp reported publicly in October, 2005 that even if NYU's 3T scanners were devoted entirely to clinical imaging "they would be full because of the demand."  Dr. Knopp also stated that "3T with the TIM technology far surpasses 3T without TIM and anything the other manufacturers have, even state-of-the-art systems at other academic centers."  Plaintiffs operate such a Siemens Trio 3T scanner with TIM technology but were excluded.  Moreover, instead of approving plaintiffs, defendants have, upon information and belief, approved NYU Hospital adding an additional 3T scanner.  Accordingly, since plaintiffs operate one of the highest quality clinical MRI scanners in New York County with demand exceeding availability, defendant CCN's statement of the reason for rejection of plaintiffs was a pretext and in fact the rejection was due to the conspiracy and antitrust violations alleged herein, thus reducing the quality and availability to patients of 3T MRI scanners.

50.    Such delays in scheduling diagnostic imaging for patients, caused by defendants' anticompetitive conduct, seriously and adversely affect patient care, by delaying patients' ability to obtain scans and diagnoses for their conditions, including cancer, pulmonary embolism, aneurysms and abscesses, when early diagnosis and treatment is critical and can mean the difference between life and death or serious physical impairment.  Further, CCN's refusal to include plaintiffs as authorized CCN providers deprives patients of access to an additional 3.0 Tesla MRI scanner which is documented to provide more accurate scanning and detection of abnormalities than the 1.5 Telsa MRI scanners which predominate in the CCN-approved sites in New York County and which is believed superior to the Phillips 3T scanners in CCN-approved facilities.  Finally, CCN in order to maximize its profits also wrongfully refuses

to pre-certify patients for services in order to limit utilization and to increase CCN's profits, leaving those patients with no access to reimbursable health care under the patient's plan. Thus, defendants' violations of the antitrust laws as herein alleged (a) have reduced the output of services; (b) have adversely affected the quality and timeliness of patient care and welfare; and (c) have artificially controlled the price and availability of such services.

51.     As hereinabove alleged, Dr. Hussman was previously approved and credentialed by CCN and plaintiffs had previously been approved by major managed care health plans. Accordingly, there was no question that Dr. Hussman and the AIC radiologists were fully qualified to provide their professional services to patient subscribers of plans under contract with CCN. Thus, plaintiffs' applications to CCN for approval should have been accepted by CCN but were not, due to the defendants' antitrust violations as alleged herein.

52.     Defendants have thereby combined and conspired to eliminate competition in the market as a whole and to eliminate plaintiffs as competitors. Plaintiffs as competitors seek by this action to remove the restraints on competition and terminate the restrictions on competition and the monopoly of defendants so that plaintiffs and others may be free to compete and so that patients' choices of providers and quality and availability of services will not be limited by defendants. Accordingly, plaintiffs' interests in terminating the unlawful conduct alleged herein coincide with patients' interests in having freedom to choose among all qualified radiologists and facilities and thereby increasing the availability, quality and output of such services. However, plaintiffs are the most appropriate parties to bring this action since they suffer the greater injury of lost revenue due to the loss of a large percentage of their patients who are covered by plans under exclusive contracts with CCN, whereas the patients' injuries are

dispersed among individual patients.

53.     By reason of plaintiffs being terminated from providing services to managed care health plans and the refusal of CCN to approve plaintiffs' applications to be admitted into the CCN network to serve patient subscribers of plans under exclusive contracts with CCN, defendants in pursuance of their unlawful combination and conspiracy and the other antitrust violations alleged, have reduced competition in the market as a whole and successfully eliminated plaintiffs as viable competition with defendants and with other CCN-approved radiologists and facilities in New York County.  Thereafter, as a result of defendants' actions targeted against plaintiffs and in order to restrain trade and limit competition in the entire New York County market, CCN has refused to pre-certify patients referred to plaintiffs or to reimburse plaintiffs for outpatient diagnostic imaging services provided by plaintiffs for covered lives under plans of CCN-contracted managed care insurers.  Accordingly, the actions taken pursuant to the conspiracy alleged herein were entirely unrelated to the quality of patient care but were solely with the intent and effect of eliminating competition from plaintiffs and eliminating competition in the New York County market as a whole.

54.     Thereafter, pursuant to the conspiracy alleged herein, defendants have redirected patients to other CCN-approved radiologists and facilities instead of sending patients to plaintiffs, even for patients who had previously had their diagnostic imaging performed by plaintiffs or who would benefit from plaintiffs' higher quality 3T scanner.  Upon information and belief, these other CCN-approved facilities have different MRI scanning equipment than that utilized by plaintiffs, and which produces data and scans different from or inferior to those provided to patients by plaintiffs.  Therefore, upon information and belief, patients who had

previously been scanned at plaintiff AIC and required follow up scans, are required to have their subsequent diagnostic imaging scans on other equipment at other CCN-approved facilities, producing different data or inferior scans and interpreted by a different radiologist.  This makes more difficult the radiologist's interpretations when compared to the patient's prior results on plaintiffs' equipment and required conversion of data with risks of error.  Moreover, if a new radiologist interprets scans on patients which have a long history with plaintiffs and multiple scans which plaintiff Dr. Hussman has interpreted and conferred upon with the patient's referring clinician, subtle yet important changes in serial scans may not be detected by the new radiologist.  Upon information and belief, there is also apprehension by a number of patients and referring physicians when they are required to change to a new radiologist because of CCN's exclusionary conduct, particularly if the patient or referring physician has developed trust in plaintiff Dr. Hussman, as is frequently the case, or the new radiologist is not subspecialized in neuroradiology, for example, as is plaintiff Dr. Hussman.  Upon information and belief, there is also an adverse emotional impact on patients in changing to a new facility.  Accordingly, defendants' unlawful conduct in not approving plaintiffs requires some patients to change facilities to continue to obtain the benefit of their managed care insurance coverage, destroys the continuity of plaintiffs' patients' care, evaluation and treatment, adversely affects comparisons of scans needed for effective patient care in diagnosis and treatment or the quality of the interpretation, and increases patient risks and costs with no saving in health care costs.

## VIOLATIONS ALLEGED

### FIRST CAUSE OF ACTION

55.     Plaintiffs repeat and reallege paragraphs 1 through 54 of this Complaint as if set forth in full herein.

56.     In furtherance of the conspiracies and other unlawful conduct herein alleged, defendants including CCN, and co-conspirators who are on the CCN Board or are members of CCN, including those in competition with plaintiffs, agreed to exclude plaintiffs Dr. Hussman and AIC from CCN and eliminate them as competitors.  As part of that unlawful conspiracy, upon information and belief, defendants and co-conspirators arranged for the termination of plaintiffs as approved providers for certain health care plans and refused to approve plaintiffs' applications to CCN.

57.     Defendants and co-conspirators thereby effectuated an unlawful group boycott of plaintiffs and excluded them as competitors by prohibiting them from participating in reimbursements for outpatient diagnostic imaging services to covered lives under plans of CCN-contracted managed care insurers.

58.     By reason of the foregoing, commencing at least as early as 2003 and continuing thereafter up to and including the date of the filing of this Complaint, defendants and co-conspirators have entered into contracts and combinations and engaged in a conspiracy in a per se unreasonable restraint of trade of the aforesaid interstate trade and commerce in outpatient diagnostic imaging services to eliminate competition in the market for provision of such services in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

24

59.     The aforesaid contracts, combination, and conspiracy have consisted of a continuing agreement, understanding, concert of action, plan and course of dealing by and between the defendants and co-conspirators, the substantial terms and purposes of which have included, among other things:

    a.    the restraint, elimination and suppression of competition in the provision of outpatient diagnostic imaging services, including restraint of competition from plaintiffs Dr. Hussman and AIC;

    b.    the elimination and suppression of price competition in the provision of outpatient diagnostic imaging services;

    c.    the elimination from the market of plaintiffs' competing services and facilities for providing outpatient diagnostic imaging services;

    d.    the fixing of prices for all CCN-approved providers;

    e.    the attempted destruction of plaintiffs Dr. Hussman, and AIC as competitors of defendants and of other facilities approved by defendants and the exclusion of plaintiffs from the market for outpatient diagnostic imaging services; and

    f.    the substantial foreclosure of plaintiffs and other competition from access to the market for providing outpatient diagnostic imaging services to subscribers of major managed care health benefit plans and thereby limiting patient choice and the quality and output of such services.

60.     Pursuant to and in furtherance of the unlawful contracts, combination and conspiracy alleged herein, and with the intent of effectuating same, defendants and co-

25

conspirators have participated in the conspiracy and done those things which they combined and conspired to do, including, among other things:

a.     effectuating a group boycott of plaintiffs, a per se violation of the Sherman Act, § 1;

b.     effectuating a horizontal agreement fixing the prices to be paid for reimbursement of outpatient diagnostic imaging services provided to plan-covered lives, a per se violation of Sherman Act § 1;

c.     effectuating a group boycott of plaintiffs knowing that CCN approval of them as providers and facilities respectively was a necessary element vital for continuation of their obtaining physician referrals of patients for outpatient diagnostic imaging services and knowing that sufficient alternative patients were not readily available due to the exclusive contracts entered into by defendant CCN;

d.     effectuating an unreasonable restraint of trade by entering into multiple long-term exclusive dealing contracts with the CCN-contracted managed care health benefit plans to provide outpatient diagnostic imaging services, thereby foreclosing a substantial and dominant share of the market from competitors, including plaintiffs; and

e.     eliminating competition for outpatient diagnostic imaging services in the relevant market and submarkets.

61.     To the extent that the aforesaid conduct, contracts, combination and conspiracies of defendants, including to horizontally fix prices among competitors and to

boycott plaintiffs as competitors, are not deemed per se violations of Sherman Act § 1, then such conduct represents and has effectuated an unreasonable restraint of trade and anticompetitive effects, by reason of defendants' market power, exclusive contracts and barriers to entry of competition.

62.     The contracts, combination and conspiracy hereinabove alleged and the wrongful acts done pursuant thereto have had the following harmful and anticompetitive effects, among others:

a.     competition in the provision of outpatient diagnostic imaging services has been suppressed and restrained;

b.     prices in the market for selling outpatient diagnostic services to managed care patient-subscribers have been controlled in an unlawful and anticompetitive manner thus depriving providers and patients of prices and choices that would be available in a free market;

c.     accessibility of such outpatient diagnostic services has been unduly limited to CCN-approved providers thereby adversely affecting the quality of patient care and limiting output;

d.     plaintiffs and other competitors in the market have been deprived of access to provide reimbursable outpatient diagnostic imaging services to millions of covered lives controlled by CCN through its exclusive contracts;

e.     plaintiffs have been refused approval by CCN to provide and be reimbursed for outpatient diagnostic imaging services;

f.   plaintiffs have suffered injury in their relationships with patients and referring doctors because of their inability to provide services which would be reimbursed by CCN for covered lives of major managed care health benefit plans and by damage to plaintiffs' good will, reputation and impairment of plaintiffs' business and property all flowing from defendants' anticompetitive conduct;

g.   plaintiffs have lost revenue and profits from being excluded from serving existing and prospective patients due to defendants' unlawful conduct;

h.   patients and, in particular, covered lives of health benefit plans under exclusive contracts with CCN, have suffered the consequences of reduced competition in that such patients have been denied the benefit of a free and competitive market for obtaining outpatient diagnostic imaging services, and price and output of such services have been restricted and quality and timeliness of patient care have been adversely affected, including delays harmful to patients' diagnoses and treatments.

63.   By reason of the conduct of defendants and co-conspirators as hereinabove alleged, plaintiffs have been, and continue to be, substantially, materially and directly injured in their businesses and property in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

64.   Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs 1 through 63 of this Complaint as if fully set forth herein.

28

65.     Since at least as early as 1995, defendants and co-conspirators, with the specific intent to obtain a monopoly, have combined and conspired to monopolize, and continue to monopolize, the provision of outpatient diagnostic imaging services to patients, in New York County and in other geographic markets, who are subscribers of and covered by major managed care health benefit plans, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

66.     Defendants and co-conspirators have conspired and attempted to acquire and maintain the power to control prices and to exclude competition in the provision of outpatient diagnostic imaging services to the aforesaid patients.

67.     Defendants and co-conspirators have increased barriers to entry to competition in the provision of outpatient diagnostic imaging services and have conspired and attempted to forestall, foreclose and limit entry into that market by plaintiffs and other competitors and potential competitors.

68.     The purpose and specific intent of the illegal acts of defendants and co-conspirators as hereinabove alleged have been to obtain and maintain the aforesaid power to control prices and exclude competition, with the effect that defendants have achieved a monopoly or there is a dangerous probability that defendants will succeed in their purpose and achieve a monopoly.

69.     By reason of the conduct of defendants and co-conspirators hereinabove alleged, plaintiffs have been and continue to be substantially, materially and directly injured in their business and property in an amount to be determined at trial.

WHEREFORE, plaintiffs ask that the Court:

a.      enter judgment that defendants have engaged in conduct in violation of Sections 1 and 2 of the Sherman Act;

b.      enter judgment for plaintiffs against each defendant on the aforesaid causes of action in an amount equal to three times the amount of damages sustained by plaintiffs as a result of their being injured in their business and property by reason of defendants' violations of the Sherman and Clayton Acts;

c.      enter judgment for plaintiffs against each defendant awarding plaintiffs their reasonable attorneys' fees and costs of this action;

d.      enter a permanent injunction and restraining defendants and their employees, successors, assigns and all those in active concert or participation with them from continuing the unlawful conduct herein alleged and adjudged; and

e.      enter such other and further orders and judgments and relief as may be necessary and proper in order to dissipate the effects of the antitrust violations and wrongful conduct complained of herein, and to restore free competition in the provision of outpatient diagnostic imaging services for the benefit of the market, plaintiffs and patients; and

f.       ordering such other and further relief as is just and proper.

<u>PLAINTIFFS DEMAND TRIAL BY JURY</u>

Dated: New York, New York
      November 14, 2006

KAPLAN, THOMASHOWER & LANDAU LLP

By: _____
          William Thomashower (WT-7071)

26 Broadway
New York, New York 10004
(212) 593-1700

      and

WEISS & ZARETT, P.C.

By: _____
          David A. Zarett (DZ-7441)

3333 New Hyde Park Road
Suite 211
New Hyde Park, New York 11042
(516) 627-7000

*Attorneys for Plaintiffs*

31